ELLIS KAUFMAN

*v.*

EDGAR LOOMIS.

*Filed at Ottawa May 19, 1884.*

1. PLEDGE—*sale under pledge—of the title—surplus funds.* The owner of securities conveyed them, by a deed of assignment, in the nature of a deed of trust, to be held by the trustee as security for the payment of certain notes upon which the grantor was liable, and it was therein provided that if the grantor should fail to meet the payments on his notes the trustee might sell the securities so pledged, at either public or private sale, and such sale was made to two of the persons for whose protection the pledge was made: *Held,* the purchasers at the trustee's sale either acquired thereby the absolute ownership of the securities, freed from all trusts, to do with as they chose, or the sale vested the ownership in the purchasers as joint trustees, to be converted into money at their best price, to first pay off their own liability,—and any surplus funds, after paying off all debts with which the trust was charged, would in equity belong to the grantor.

2. GUARANTY—*release—failure to avail of proceeds of collaterals which are lost.* A & B were indebted to a bank upon a note of $3000, and they were at the same time liable to the bank upon a note of $3500, given by them to C for his accommodation, and also upon another note for $1000, upon all of which D was liable as guarantor, and A & B owed the bank $2420 upon their own note, on which D was not liable. A & B and C desired an extension of the time of payment. To procure such time, C transferred to F, by a deed, certain securities, to secure, first, D, for carrying the $3500 note and guaranteeing the $3000 and $1000 notes; and second, to secure to the bank the payment of the $2420, and the surplus to C, or his assigns. The trustee sold the securities to D and the bank for $1500, after which an offer was made to the bank and D of $11,000 for the securities, but the bank

refused to sell at that price, and demanded $15,000, shortly after which the securities were rendered worthless by a decision of the Supreme Court: *Held*, that the bank, by refusing to sell the securities, having acted honestly in trying to get a better price, did not release the liability of D as guarantor of the $3000 note.

3. In a suit upon the guaranty of the payment of a note owned by a bank, the fact that the bank held, before the suit, an assignment through a trustee of a patent right, and some claims for damages for an alleged infringement of the patent, and was offered more for such patent and claims than enough to have paid the note, such assignment having been made by the principal debtor, and the patent and claims afterwards prove valueless from an adverse ruling of the courts, will not operate to discharge the guarantor, although he may have urged the bank to accept the offer for the patent. It was the duty of the bank, as a trustee, to obtain the largest sum that could be realized, and the making of a mistake, while acting in good faith, will not subject the bank to a loss.

Appeal from the Appellate Court for the First District;— heard in that court on appeal from the Superior Court of Cook county; the Hon. Sidney Smith, Judge, presiding.

The evidence for the defence tends to show that on March 14, 1878, Loomis was liable as guarantor for the accommodation of Babcock & Ten Broeke, for $3000, and upon an accommodation note made by him for the accommodation of S. D. Cozzens, for $3500, and as accommodation guarantor for another debt of Babcock, guaranteed by Ten Broeke, of $1000,—in all amounting to about $7500. The $3000 note belonged to the International Bank, and Babcock & Ten Broeke owed the bank about $2420 upon their own note, with which Loomis had no connection. Neither Babcock & Ten Broeke nor Cozzens were prepared to pay their respective debts, and wanted the payment extended for six months. Loomis required, before he would consent to the extension, that the accrued interest should be all paid, and this was done. Lœwenthal was the president and general manager of and for the bank, and he refused to consent to the extension of payment unless some additional security were given on the $2420 note. Cozzens claimed to own a patent, or an

interest in a patent, called "Tanner's car-brake patent," and
to have a demand against certain railroad companies for
violation of his rights in the use of the Tanner car-brake.
Ten Broeke also claimed some equity in the patent, and per-
haps in the claim against these railroad companies, and Coz-
zens held releases of these respective railroad companies,
signed by James D. Mowry, trustee, and approved by Coz-
zens, from all liability for making and using the Tanner
brake, ready to be delivered upon the payment of damages
by such companies, respectively, such as might be agreed
upon.   It was accordingly arranged, by consent of all par-
ties concerned, that the payment of the several debts should
be extended six months, and Cozzens should deliver to Mr.
Bisbee (who was the attorney of Loomis) the releases men-
tioned, and also make to Bisbee an assignment of all interest
and claim against these railroad companies, for the use of the
Tanner car-brake, in trust,—first, to secure Loomis for carry-
ing the $3500 debt, and for guaranteeing, upon renewal, the
$3000 note, and for guaranteeing the $1000 note; and sec-
ond, to secure the International Bank the payment of the
$2420 note.   This was done, and the fact was recited in a
deed of Cozzens, under seal, in which he authorized Bisbee,
in default of payment of any or all of the above debts, to
sell the assignment made by Cozzens to Bisbee, and also the
releases, at public or private sale, without notice, and to
apply the proceeds of the sale to the payment of the costs of
making said sale and all reasonable attorney's fees to which
said Bisbee may be entitled for doing the business in this
behalf, and also to the payment of the $3500 debt, and to
the payment of the $3000 note guaranteed by said Loomis,
and to the payment of the $1000 debt; and after the pay-
ment in full of such indebtedness, then the balance of the
proceeds to be applied to the payment of the $2420 note,
and the surplus, if any, to be returned to Cozzens, or his
assignees.

The evidence also tends to show that all this indebtedness remaining unpaid after the lapse of six months, at the request of Loomis and Lœwenthal, Mr. Bisbee advertised these releases and the assignment for sale, Loomis and Lœwenthal paying for the advertisement, and at a public vendue the same were struck off to the bank and Loomis at the price of $1500. No money was paid to Bisbee in consummation of this. Neither the assignment of the patent right and claim, nor the releases, were ever delivered to either the bank or to Loomis, under this sale, but the same remained in the hands of Bisbee. The evidence also tends to prove that before the bidding at the sale it was agreed between Lœwenthal, for the bank, and Loomis, that if the same were bought by them, out of the avails the notes for which Loomis was bound should be first paid, and then the $2420 note owned by the bank should be paid. Evidence was also given that Loomis had promised Ten Broeke that the surplus should go to Ten Broeke or Cozzens, or to both, but no evidence that the bank was a party to this promise, or that Lœwenthal or any officer of the bank had any information about this promise by Loomis to Ten Broeke. The evidence also tended to prove that the questions whether this patent was valid or not, and whether the railroad companies had infringed the same, (on which the validity of the claim of Cozzens against the railroad companies depended,) had been, and still were, in litigation. The Circuit Court of the United States, in a test suit, had held the patent valid, and ruled that the brake used by the railroad companies was an infringement, and that judgment was before the Supreme Court of the United States for review, and the case had been argued before the Supreme Court, but was not yet decided, and it was generally thought the judgment of the Circuit Court would be affirmed. The evidence also tended to prove that in this state of affairs the representatives of the railroad companies approached Bisbee, for the purpose of buying the releases in his hands,

and offered to pay for the same the sum of $11,000. This offer was communicated by Bisbee to Loomis, and he consented that the offer be accepted. Bisbee urged it should be accepted, and that both Bisbee and Loomis notified Lœwenthal of the offer, and asked him to consent that the offer be accepted, but that Lœwenthal refused to consent to accept $11,000, but told Bisbee to offer to sell at $15,000, and that for the reason that Lœwenthal refused to consent to a sale for $11,000 the negotiation failed. The evidence also tends to show that soon afterwards the decision of the Supreme Court of the United States was rendered, holding, in one case, that the patent was void, and in another that the brake used by the railroad companies was not an infringement, and that by reason of these decisions the securities put into the hands of Bisbee by Cozzens became valueless.

This is an action brought by Kaufman, against Loomis, upon his guaranty upon the $3000 note given by Babcock & Ten Broeke to the International Bank, which had been assigned to Kaufman by the bank merely for collection. The bank and Loomis are the real parties in interest.

After the above evidence was given for the defence, the court was asked by the plaintiff to give the jury the following among other instructions, which the court refused to give,— that is:

"No. 1. The jury are instructed, as a matter of law, that the pretended patent right here brought in question, and the amount at one time offered by the Illinois Central Railroad Company and the Chicago, Burlington and Quincy Railroad Company, constitute no defence in this case, and you will entirely disregard all the evidence pertaining to same."

And plaintiff excepted to the ruling in refusing this instruction.

The court, at the request of the defendant, gave to the jury the following instruction:

"No. 2. If the jury believe, from the evidence, that the securities in question were bid in by Lœwenthal and Loomis, at the sale by Bisbee, on the understanding and agreement between them that the proceeds of said securities should be applied to the same uses as was provided in the trust deed to Bisbee, and that afterwards said securities could have been sold for $11,000,—that is to say, if the Burlington and Quincy and Illinois Central railroad companies offered that sum in the aggregate for the releases in evidence,—and that Bisbee approved of and desired such sale, and that a sum could thereby have been realized which would, in pursuance of the terms of said agreement, have paid the note sued on in this case and the other notes mentioned in the trust deed to Bisbee, and that Loomis wished said sale to be made and said note paid, and that Lœwenthal knew the facts aforesaid, and that $11,000 could be realized as above, and still refused to let said securities be sold, and prevented a sale of the same, and that such sale would have been made and said note paid but for such refusal of said Lœwenthal, and that said securities, shortly after such refusal of Lœwenthal, became valueless, then the jury are instructed that the facts aforesaid, if proven, operated to release said Loomis from all obligations as guarantor of said note."

—To the giving of which instruction the plaintiff, by his counsel, excepted.'

Verdict and judgment were given for defendant, and this judgment, on appeal, was affirmed in the Appellate Court, and plaintiff appeals to this court.

Messrs. ROSENTHAL & PENCE, for the appellant:

The trustee's sale in October, 1878, to Loomis and Lœwenthal passed no title. No money was paid, and the trustee executed no assignment, but retained all the papers as before. Loomis testifies that the collaterals were still held for the same purposes. Bisbee still remained trustee, and could not

be permitted to violate his trust. The pledge remaining in Bisbee's hands as security for all the notes, in the same way, after as before the pretended sale, he had the power to sell and dispose of the same, and could not be controlled by one of his beneficiaries. He represented both the pledger and pledgees. The bank can not be held responsible for his neglect or lack of judgment.

The pledger having the general property in the pledge, might have sold it, and compelled its restoration upon paying the money to redeem; but not offering to redeem, the bank can not be charged with any depreciation or loss. *Rozet* v. *McClellan*, 48 Ill. 345; *Granite Bank* v. *Richardson*, 7 Metc. 407; *Robinson* v. *Hurley*, 11 Iowa, 410; *Smouse* v. *Bail*, 1 Grant's Cases, 398; *Ward* v. *Morgan*, 5 Sneed, 79; Story on Bailments, sec. 315.

There is no evidence that Cozzens, or Bisbee, or Loomis, or Lœwenthal, had any title to this pretended patent right claim.

Messrs. Dent & Black, for the appellee:

Lœwenthal, by preventing the sale of the releases, and causing their loss, discharged Loomis from all liability on account of the guaranty in question.

Sureties and guarantors are favored, and the courts will lay hold of any act that favors them. *Ludlow* v. *Simons*, 2 Caines' Cases, 56; *Law* v. *East India Co.* 4 Ves. 824; *Kingsbury* v. *Westfall*, 61 N. Y. 356; *Stull* v. *Hance*, 62 Ill. 55.

If a creditor has a surety for a debt, and also a lien on any kind of property belonging to the principal as a security for the same debt, and he relinquishes the property, the surety is released to the extent of the value of the property so lost. *Willis* v. *Davis*, 3 Minn. 17; *Cummings* v. *Little*, 45 Maine, 183; *Loop* v. *Summers*, 3 Rand. 511; *New Hampshire Savings Bank* v. *Concord*, 15 N. H. 119; *Armor* v. *Ames*, 4 La. Ann. 172; *Wharton* v. *Donnan*, 83 Pa. St. 40; *Ives* v. *Bank of Lansing*, 12 Mich. 361; *Bonney* v. *Bonney*, 29 Iowa, 448;

*Hurd* v. *Spencer,* 40 Vt. 581; *Foss* v. *Chicago,* 34 Ill. 488;
*American Bank* v. *Baker,* 4 Metc. 164; *Holland* v. *Johnson,*
51 Ind. 346; *McMullen* v. *Winkle,* 39 Miss. 142; *Mayhew*
v. *Crickett,* 2 Swanst. 185; *Dixon* v. *Ewing,* 3 Ham. 281;
*Springer* v. *Toothaker,* 43 Maine, 381; *State Bank* v. *Edwards,*
20 Ala. 512; *Sneed* v. *White,* 3 J. J. Marsh. 525.

Among many other cases which hold the surety discharged
by the creditor causing or suffering the release of a levy on
the property of the principal to the injury of the surety, the
following may be referred to: *Houston* v. *Hurley,* 2 Del. Ch.
247; *Morley* v. *Dickinson,* 12 Cal. 561; *Spencer* v. *Thompson,*
6 Irish C. L. 537; *Comstock* v. *Creon,* 1 Rob. 528; *Alexander*
v. *Bank of Commonwealth,* 7 J. J. Marsh. 580; *Winston* v.
*Yeargin,* 50 Ala. 340; *Bank* v. *Fordyce,* 9 Pa. St. 275; *Shannon* v. *McMullin,* 25 Gratt. 211; *Finley* v. *King,* 1 Head, 123;
*Melles* v. *Green,* 5 Grant's Ch. 655; *Parker* v. *Nations,* 33
Texas, 210; *Davis* v. *Mikell,* 1 Freem. Ch. 655; *Lumsden* v.
*Leonard,* 55 Ga. 374; *Quick* v. *Black,* 2 C. E. Green, 189;
*Robeson* v. *Roberts,* 20 Ind. 155.

A surety is discharged when the creditor accepts as collateral security for a debt the obligation of a third person,
and through his negligence in failing to enforce the obligation
it is lost. *Kemmerer* v. *Wilson,* 31 Pa. St. 110; *Pickens* v.
*Yearborough's Admr.* 26 Ala. 417; *Noland* v. *Clark*, 10 B. Mon.
239; *Jennison* v. *Parker,* 7 Mich. 355; *Sellers* v. *Jones,* 22
Pa. St. 423; *Hill* v. *Bourcier,* 29 La. Ann. 841; *Lamberton*
v. *Windom,* 18 Minn. 506; *Douglas* v. *Reynolds,* 7 Pet. 113;
*Lee* v. *Baldwin,* 10 Ga. 218; *Shippen's Admr.* v. *Clapp,* 36
Pa. St. 89; *Wakeman* v. *Gowdy,* 10 Bosw. 208.

Mr. JUSTICE DICKEY delivered the opinion of the Court:

We think the Superior Court of the county of Cook erred
in refusing instruction No. 1, asked by appellant, and in giving instruction No. 2, asked by the appellee, and for that
cause the Appellate Court erred in affirming the judgment.

There is some discussion as to the legal effect of the supposed sale of these securities by Bisbee to the bank, and to Loomis. Without determining what effect is to be attributed to the proceedings connected with that supposed sale, it is clear that either the sale was entirely inoperative, and produced no change in the *status* of these securities; or the sale passed the absolute ownership of these securities to the bank and Loomis, as joint owners, freed from all trusts, to be used by the purchasers for their own profit, without reference to the debts and liabilities for which Bisbee had before that held them, the purchasers taking the same rights which strangers purchasing would have taken had they bid and paid the $1500, and received a written transfer of the same to them from Bisbee; or the sale vested such ownership in the bank and Loomis jointly, as trustees, to realize the most that might be had for such securities by these trustees, by the exercise of reasonable judgment, care and diligence to that end, for the benefit, first, of Loomis, in relieving him from his liabilities as guarantor, or otherwise, in relation to the three debts for which he was personally bound; second, for the benefit of the bank, in procuring the payment of the $2420 note, for which Loomis was not personally liable; and third, for the benefit of whomsoever might be entitled to the surplus, if any; and the proofs tend to show that in such case this surplus, if any had been realized, would have belonged, in equity, one-half to the bank, and one-half to Cozzens and Ten Broeke, or one of them.

On the first hypothesis these securities remained, after the sale, vested in Bisbee, as trustee, with full power of sale, and no consent of the bank or of Lœwenthal was at all necessary to the sale if Bisbee thought best to sell to the railroad companies, and neither Lœwenthal nor the bank was under any obligations or duty to assume any responsibility in the matter, and neither was bound to give consent, even if good judgment

required the sale to be made to the railroad companies on the terms offered.

On the second hypothesis, the bank, being an absolute joint owner with Loomis, had the absolute right to refuse to sell its interest, or to sell the same, as it might choose, and the other joint owner had no rights which could lawfully limit the exercise of that choice.

On the third and last hypothesis, the bank and Loomis being joint trustees, and Loomis being one of the beneficiaries, he had a right to demand of the bank fidelity in the exercise of the trust, and so had Cozzens and Ten Broeke, who were interested with the bank in the surplus which might remain after relieving Loomis from his personal liability on the first three debts, and after paying the $2420 note held by the bank. The proof tends to show that when the offer of $11,000 was made for these securities it was generally thought that the decision of the Supreme Court of the United States would declare the validity of the same, and there is not one word of proof tending to show that Lœwenthal, at the time when he refused to give the consent of the bank to the proposed sale for $11,000, had not good reason to believe, or did not believe, that a larger amount could and ought to be realized from the sale. If, in good faith, as a trustee, he exercised his honest judgment in so refusing, and acted, as he supposed, for the best interests of all concerned,—unless that judgment was grossly erroneous, with the lights he had,—he surely can not be charged with wronging any one by acting upon his judgment. The mere fact that it turned out afterwards that he was mistaken, does not charge him with a wrong done to any one.

We think the proofs do not tend to support the exact hypothesis assumed in the second instruction given at request of appellee. That hypothesis varies from the third hypothesis, *supra,* in this only, that it would give the entire surplus to Cozzens, after fulfilling the supposed trusts. But

even if the proofs tended to support that hypothesis, the reasoning, *supra*, as to the third hypothesis applies thereto with more cogency. Upon the hypothesis stated in the instruction, had the decision of the Supreme Court affirmed the validity of the patent, and of Cozzens' claim against the railroad companies, and had Lœwenthal consented to the sale for $11,000, Cozzens, who also was a mere surety, might, for aught shown in these proofs, have justly complained that his securities had been wantonly and foolishly sacrificed, and in such case the bank might (if a trustee be a guarantor of his own wisdom,) have well been called to an account by Cozzens for consenting to a sale of these securities for $11,000.

The judgment of the Appellate Court is therefore reversed, and the cause remanded, that the judgment of the Superior Court may be reversed, and a new trial had.

*Judgment reversed.*